UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

JEFFREY ALLEN WEDDINGTON, II,

          Petitioner,

v.                                          Case No. 3:21-cv-691-BJD-PDB

SECRETARY, FLORIDA
DEPARTMENT OF CORRECTIONS,
and FLORIDA ATTORNEY GENERAL,

          Respondents.

_____

## ORDER

### I. STATUS

Petitioner, Jeffrey Allen Weddington, II (Weddington), an inmate of the Florida penal system, is proceeding on a counseled Amended Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody (Doc. 8; Amended Petition). He challenges a 2017 state court (Nassau County, Florida) judgment of conviction for sexual battery, domestic felony battery, and false imprisonment.[1] *Id.* Respondents filed a Response to the Amended

---

[1] The Court takes judicial notice of Petitioner's state court dockets. *See McDowell Bey v. Vega*, 588 F. App'x 923, 926 (11th Cir. 2014) (stating that a district court may consider the contents of a publicly available docket sheet of the plaintiff's criminal case).

Petition (Doc. 13; Response),[2] and Petitioner filed a Reply to their Response (Doc. 16; Reply). Upon review, no evidentiary proceedings are warranted in this Court.[3]

## II. STANDARD OF REVIEW

### A. Standard Under AEDPA

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs a state prisoner's federal habeas corpus petition. *See Ledford v. Warden, Ga. Diagnostic & Classification Prison*, 818 F.3d 600, 642 (11th Cir. 2016), *cert. denied*, 137 S. Ct. 1432 (2017). "'The purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction.'" *Id.* (quoting *Greene v. Fisher*, 565 U.S. 34, 38 (2011)).

---

[2] For purposes of reference to pleadings and exhibits, the Court will cite the document page numbers assigned by the Court's electronic docketing system.

[3] "In a habeas corpus proceeding, the burden is on the petitioner to establish the need for an evidentiary hearing." *Jones v. Sec'y, Fla. Dep't of Corrs.*, 834 F.3d 1299, 1318 (11th Cir. 2016) (citing *Chavez v. Sec'y Fla. Dep't of Corrs.*, 647 F.3d 1057, 1060 (11th Cir. 2011)). "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) (citation omitted). "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Id.* The Court finds that "further factual development" is unnecessary. *Turner v. Crosby*, 339 F.3d 1247, 1275 (11th Cir. 2003). Thus, an evidentiary hearing will not be conducted.

The first task of the federal habeas court is to identify the last state court decision, if any, that adjudicated the petitioner's claims on the merits. *See Marshall v. Sec'y Fla. Dep't of Corrs.*, 828 F.3d 1277, 1285 (11th Cir. 2016). The state court need not issue an opinion explaining its rationale in order for the state court's decision to qualify as an adjudication on the merits. *See Harrington v. Richter*, 562 U.S. 86, 100 (2011). Where the state court's adjudication on the merits is unaccompanied by an explanation:

> [T]he federal court should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning. But the State may rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed.

*Wilson v. Sellers*, 584 U.S. 122, 125–26 (2018).

When a state court has adjudicated a petitioner's claims on the merits, a federal court cannot grant habeas relief unless the state court's adjudication of the claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1),

(2). A state court's factual findings are "presumed to be correct" unless rebutted "by clear and convincing evidence." *Id.* § 2254(e)(1).

> AEDPA "imposes a highly deferential standard for evaluating state court rulings" and "demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal quotation marks omitted). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fair[-]minded jurists could disagree on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (internal quotation marks omitted). "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* [at 102] (citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)). The Supreme Court has repeatedly instructed lower federal courts that an unreasonable application of law requires more than mere error or even clear error. *See, e.g., Mitchell v. Esparza*, 540 U.S. 12, 18 (2003); *Lockyer*, 538 U.S. at 75 ("The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."); *Williams v. Taylor*, 529 U.S. 362, 410 (2000) ("[A]n unreasonable application of federal law is different from an incorrect application of federal law.").

*Bishop v. Warden, GDCP*, 726 F.3d 1243, 1253–54 (11th Cir. 2013) (internal citations modified).

## B. Exhaustion and Procedural Default

Before bringing a § 2254 habeas action in federal court, a petitioner must exhaust all state court remedies that are available for challenging his state conviction. *See* 28 U.S.C. § 2254(b)(1)(A). To do so, he must "fairly present[]" every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review. *Castille v. Peoples*, 489 U.S. 346, 351

4

(1989) (emphasis omitted). Thus, to properly exhaust their claims, "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process," *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999), thereby alerting the appropriate state court of "the federal nature of the claim[s]," *Baldwin v. Reese*, 541 U.S. 27, 29 (2004). *See also Pope v. Rich*, 358 F.3d 852, 854 (11th Cir. 2004) (noting "that *Boerckel* applies to the state collateral review process as well as the direct appeal process.").

A state prisoner's failure to properly exhaust available state remedies results in a procedural default which raises a potential bar to federal habeas review. Under the doctrine of procedural default:

> [A] federal court will not review the merits of claims, including constitutional claims, that a state court declined to hear because the prisoner failed to abide by a state procedural rule. *See, e.g.*, *Coleman v. Thompson*, 501 U.S. 722, 747–748 (1991); *Wainwright v. Sykes*, 433 U.S. 72, 84–85 (1977). A state court's invocation of a procedural rule to deny a prisoner's claims precludes federal review of the claims if, among other requisites, the state procedural rule is a nonfederal ground adequate to support the judgment and the rule is firmly established and consistently followed. *See, e.g.*, *Walker v. Martin*, 562 U.S. 307, 316 (2011); *Beard v. Kindler*, 558 U.S. 53, 60–61 (2009). The doctrine barring procedurally defaulted claims from being heard is not without exceptions. A prisoner may obtain federal review of a defaulted claim by showing cause for the default and prejudice from a violation of federal law. *See Coleman*, 501 U.S. at 750.

*Martinez v. Ryan*, 566 U.S. 1, 9–10 (2012) (internal citations modified).

5

"To show cause, the petitioner must demonstrate 'some objective factor external to the defense' that impeded his effort to raise the claim properly in state court." *Ward v. Hall*, 592 F.3d 1144, 1157 (11th Cir. 2010) (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). Once cause is established, "the petitioner also must show actual prejudice from the alleged constitutional violation." *Id.* (citing *Sykes*, 433 U.S. at 84). "[I]n order to show prejudice, a petitioner must demonstrate that 'the errors at trial actually and substantially disadvantaged his defense so that he was denied fundamental fairness.'" *Id.* (quoting *McCoy v. Newsome*, 953 F.2d 1252, 1261 (11th Cir. 1992)).

In the absence of a showing of cause and prejudice, a petitioner may still receive consideration on the merits of a procedurally defaulted claim if he can show that a fundamental miscarriage of justice would occur. As explained by the Eleventh Circuit:

> "[I]n an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." *Carrier*, 477 U.S. at 496. "This exception is exceedingly narrow in scope," however, and requires proof of actual innocence, not just legal innocence. *Johnson v. Alabama*, 256 F.3d 1156, 1171 (11th Cir. 2001).

*Ward*, 592 F.3d at 1157 (internal citations modified). "To meet this standard, a petitioner must 'show that it is more likely than not that no reasonable juror would have convicted him' of the underlying offense." *Johnson*, 256 F.3d at

6

1171 (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)). Additionally, "'[t]o be credible,' a claim of actual innocence must be based on reliable evidence not presented at trial." *Calderon v. Thompson*, 523 U.S. 538, 559 (1998) (quoting *Schlup*, 513 U.S. at 324). With the rarity of such evidence, in most cases, allegations of actual innocence are ultimately summarily rejected. *Schlup*, 513 U.S. at 324.

### C. Ineffective Assistance of Counsel

"The Sixth Amendment guarantees criminal defendants effective assistance of counsel. That right is denied when a defense counsel's performance falls below an objective standard of reasonableness and thereby prejudices the defense." *Yarborough v. Gentry*, 540 U.S. 1, 5 (2003) (citing *Wiggins v. Smith*, 539 U.S. 510, 521 (2003); *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). To establish ineffective assistance, a person must show that: (1) counsel's performance was outside the wide range of reasonable, professional assistance; and (2) counsel's deficient performance prejudiced the challenger in that there is a reasonable probability that the outcome of the proceeding would have been different absent counsel's deficient performance. *Strickland*, 466 U.S. at 687. As explained in *Richter*:

> To establish deficient performance, a person challenging a conviction must show that "counsel's representation fell below an objective standard of reasonableness." 466 U.S. at 688. A court considering a claim of ineffective assistance must apply a "strong

presumption" that counsel's representation was within the "wide range" of reasonable professional assistance. *Id.* at 689. The challenger's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687.

With respect to prejudice, a challenger must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

*Richter*, 562 U.S. at 104 (internal citations modified).

Notably, there is no "iron-clad rule requiring a court to tackle one prong of the *Strickland* test before the other." *Ward*, 592 F.3d at 1163. Since both prongs of the two-part *Strickland* test must be satisfied to show a Sixth Amendment violation, "a court need not address the performance prong if the petitioner cannot meet the prejudice prong, and vice-versa." *Id.* (citing *Holladay v. Haley*, 209 F.3d 1243, 1248 (11th Cir. 2000)). As stated in *Strickland*: "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." 466 U.S. at 697.

"The question is not whether a federal court believes the state court's determination under the *Strickland* standard was incorrect but whether that

8

determination was unreasonable – a substantially higher threshold." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quotation marks omitted). If there is "any reasonable argument that counsel satisfied *Strickland*'s deferential standard," then a federal court may not disturb a state-court decision denying the claim. *Richter*, 562 U.S. at 105. As such, "[s]urmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). "Reviewing courts apply a 'strong presumption' that counsel's representation was 'within the wide range of reasonable professional assistance.'" *Daniel v. Comm'r, Ala. Dep't of Corr.*, 822 F.3d 1248, 1262 (11th Cir. 2016) (quoting *Strickland*, 466 U.S. at 689). "When this presumption is combined with § 2254(d), the result is double deference to the state court ruling on counsel's performance." *Id.* (citing *Richter*, 562 U.S. at 105); *see also Evans v. Sec'y, Dep't of Corrs.*, 703 F.3d 1316, 1333–35 (11th Cir. 2013) (en banc) (Jordan, J., concurring); *Rutherford v. Crosby*, 385 F.3d 1300, 1309 (11th Cir. 2004).

### III. ANALYSIS

On July 13, 2021, with help from counsel, Weddington filed his original Petition in this Court, along with a motion to stay and hold the Petition in abeyance pending the exhaustion of his state court remedies. Docs. 1, 3. This Court stayed and administratively closed the case on July 14, 2021, and reopened it after exhaustion on June 7, 2022. Docs. 4, 7. On August 5, 2022,

through counsel, Weddington filed his Amended Petition, raising four grounds for habeas relief.[4] *See* Doc. 8.

### Ground One

As Ground One, Weddington alleges the trial judge, The Honorable Richard Foster, departed from his role of a neutral arbiter by informing the entire jury panel that the State's evidence was sufficient to support a conviction, thereby violating Weddington's Fourteenth Amendment due process rights. Doc. 8 at 15–21.

Weddington presented this claim in argument one of his direct appeal initial brief, but only in the context of state law. *See* Resp. Ex. C at 15–19. He made no argument or reference to the United States Constitution or any decision by the United States Supreme Court. *See id.* Because he did not fairly present the federal nature of his claim, he deprived the state court of a meaningful opportunity to review the claim. *See Baldwin*, 541 U.S. at 29. Since future attempts to exhaust this claim would be futile, the claim is procedurally defaulted. *Bailey v. Nagle*, 172 F.3d 1299, 1303 (11th Cir. 1999). Moreover, Weddington has demonstrated neither cause and prejudice nor a miscarriage of justice to overcome the procedural default.

---

[4] Respondents concede, and the Court finds based upon a review of the state court docket, the Amended Petition is timely. *See* Doc. 13 at 9–10.

Nevertheless, even assuming the claim is not procedurally defaulted, it must still be denied on the merits for the reasons stated below. Weddington's argument is premised on the trial judge's comments after the jury was selected. The judge directed his comments to the prospective jurors who were being excused, but the comments were made while the entire jury panel was still present.[5] These comments are as follows:

> Our jury system only works if it is supported and honored by our citizens. For those of you who came in this morning, some of whom I believe had a determination not to serve, shame on you. Other than taking our money for taxes, the government does not require much of us. We don't even require military service anymore. We don't even require you to vote. But, as I mentioned to you on Friday, service on a jury is both a civil and patriotic obligation which all good citizens should perform, so I'm always puzzled by prospective jurors who quickly announce, I can't do the job, I can't be fair and impartial. I'm troubled by prospective jurors who announce the defendant is guilty. You've heard no evidence whatsoever, so the mere fact that the State charges someone with a crime and seats him at the defense table is enough for you to declare he's guilty without a trial, the State has to prove absolutely nothing.

> I don't believe any of us think that we will be seated at the defendant's chair, but you should stop and reflect on what you would want to happen should you be seated there. Would you want citizens who believe in this system[,] who are required to uphold the law[,] to sit in judgment on you?

---

[5] Previously, the trial court excused several prospective jurors for cause, because they had indicated they could not follow the law either because they believed Weddington was guilty or needed more than just testimonial evidence or more than one person's testimony to convict him. *See* Resp. Ex. B at 78–94.

And for those of you who demand more than what the State requires, that is[,] that testimony of a witness is insufficient to convict someone, imagine yourself alone with me in this courtroom and I walk over and pick up my gavel, which is a hefty[,] little thing, and I knock you on the head. I'm innocent, because your only case is your own testimony, and for many, many, many of you who responded today, that is insufficient for the State to bring its case against the defendant.

If you're not seated to my right, you are excused from your jury summons. I appreciate you coming down Friday for jury qualifications. You are excused today, but I would encourage you to stop and think a moment about what our form of government means, what your obligations are to support it, and how you responded today.

Thank you. You are excused.

Resp. Ex. B at 97–99.

The First DCA rejected Weddington's argument on direct appeal, specifically finding that the "fairness problems" that were present in *Grigg v. State*, 230 So. 3d 943 (Fla. 1st DCA 2017), relied on by Weddington, were not present in this case, because:

First, the trial judge's gavel hypothetical in this case bears no resemblance to the sexual battery and battery charges against [Weddington], and the judge's comments about the hypothetical did not express his view on the weight of the evidence, the credibility of a witness, or the guilt of [Weddington]. Second, the judge did not express a prosecution-friendly view of [Weddington's] case and his comments simply emphasized the importance of jury service and the rule of law, including the presumption of innocence and the state's burden of proof. Accordingly, under these circumstances, the trial judge's comments do not amount to fundamental error.

12

*Weddington*, 270 So. 3d at 470.

Addressing this claim in accordance with the deferential standard for federal court review of state court adjudications, the Court finds, upon thorough review of the record and the applicable law, that the state court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d).

Nevertheless, even if the state court's adjudication is not entitled to deference, this claim must still be denied on the merits. When viewed in proper context, the trial judge's comments do not "demonstrate such pervasive bias and unfairness that they prejudice one of the parties in the case." *United States v. Ramirez-Chilel*, 289 F.3d 744, 750 n.6 (11th Cir. 2002). As the First DCA explained, the trial judge did not express his view on the weight of the evidence, the credibility of any witnesses, or Weddington's guilt. *See* Fla. Stat. § 90.106 ("A judge may not sum up the evidence or comment to the jury upon the weight of the evidence, the credibility of the witnesses, or the guilt of the accused."); *Hamilton v. State*, 109 So. 2d 422, 424–25 (Fla. 3d DCA 1959) ("Where [a judge's] comment expresses or tends to express the judge's view as to the weight of the evidence, the credibility of a witness, or the guilt of an

13

accused, it thereby destroys the impartiality of the trial to which the litigant
or accused is entitled.").

In addition, the trial judge's comments did not express a prosecution-
friendly view of the case, but simply emphasized the importance of jury service
and the rule of law, including the presumption of innocence and the State's
burden of proof. *Cf. Sparks v. State*, 740 So. 2d 33, 37 (Fla. 1st DCA 1999)
(finding the trial judge assumed the role of prosecutor when he pointed out
evidence that the prosecutor could use for impeachment). Further, the trial
judge instructed the jury, both before and after *voir dire*, that the case must be
decided based solely on the evidence (or lack thereof) and the law, and in his
final instruction, he cautioned the jury to "disregard anything [he] may have
said or done that made [them] think [he] preferred one verdict over another."
Resp. Ex. A at 359–60; Resp. Ex. B at 10, 103. Therefore, Ground One is denied.

**Ground Two**

As Ground Two, Weddington alleges his trial counsel was ineffective for
failing to object to the prosecutor's closing arguments that violated his right to
due process, bolstered T.G.'s testimony, expressed the prosecutor's personal
opinion on Weddington's guilt and truthfulness, denigrated Weddington and
his defense, were inflammatory, and shifted the burden of proof. Doc. 8 at 21–
31.

14

Weddington raised similar claims in grounds seventeen through twenty-one and ground twenty-three of his Rule 3.850 motion. Resp. Ex. I at 20–25. The trial court summarily denied the claims as follows:

<u>Ground Seventeen</u>

In Ground Seventeen, [Weddington] argues his lawyer should have objected when the State allegedly made improper comments about the credibility of [Weddington's] testimony. Specifically, [Weddington] points to this portion of the trial transcript:

MS. COLLINS [for the State]: . . . .
Let's start with where Mr. Sessions started. The State wants you to completely disregard the defendant's testimony. Yeah, we do. It's not true. And you can use your common sense in judging what is true, and if you find his testimony is not credible, throw it out. You don't have to give it any weight at all.[6]

---

[6] The prosecutor then said:

Mr. Sessions wanted to paint a picture that reasonable doubt [is] somehow weighing the victim's testimony against the defendant's testimony, and if you have a wonder, if you have a wonder, that must be reasonable doubt. That's not how it works. What's credible? The victim is credible. The defendant lied on the stand.
. . . Mr. Sessions is right, he didn't have to get up there and testify, he chose to. He admitted what he could not deny and then he would deny everything that he could not admit. Admit just enough to make you think, [w]ell, maybe he's telling the truth, but then to deny the things that are most important. He's not credible. You heard his answers on my cross-examination. It's not credible, toss it out. You don't have to give his testimony any weight at all, none.

Resp. Ex. B at 289–90. This part of the closing argument is related to the subsequent grounds addressed by the trial court.

The purpose of closing argument is to review the evidence and illuminate the reasonable inferences the jury may draw from that evidence. *Bertolotti v. State*, 476 So. 2d 130, 134 (Fla. 1985); *see, e.g.*, *Merck v. State*, 975 So. 2d 1054, 1064 (Fla. 2007) (finding no impropriety in a prosecutor's comments based on the facts in evidence and common-sense inferences from those facts). Lawyers are afforded wide latitude during closing argument. *Breedlove v. State*, 413 So. 2d 1, 8 (Fla. 1982). Counsel may "argue credibility of witnesses or any other relevant issue so long as the argument is based on the evidence." *Miller v. State*, 926 So. 2d 1243, 1254–55 (Fla. 2006). And[] "trial counsel cannot be deemed ineffective for failing to object to arguments that are proper." *Rogers v. State*, 957 So. 2d 539, 549 (Fla. 2007).

Here, Defense Counsel had no basis for objecting to the State's comments because a lawyer is allowed to argue that an opposing witness is not credible. As such, the Court denies Ground Seventeen of [Weddington's] motion.

## Ground Eighteen

In Ground Eighteen, [Weddington] makes an argument that is closely related to his claim in Ground Seventeen. [Weddington] maintains his lawyer should have objected when, during its closing argument, the State characterized the victim's testimony as credible.

As set forth in the discussion of Ground Seventeen, it is proper for a lawyer to make arguments about the credibility of witnesses. *Miller*, 926 So. 2d at 1254–55. Thus, as in Ground Seventeen, Defense Counsel did not provide ineffective assistance when he failed to make a meritless objection to a proper argument. *See Rogers*, 957 So. 2d at 549. Accordingly, the Court denies Ground Eighteen of [Weddington's] motion.

## Ground Nineteen

In Ground Nineteen, [Weddington] again maintains that his lawyer should have objected when the State questioned [Weddington's] credibility during another portion of the State's

closing argument. The Court denies Ground Nineteen of [Weddington's] motion for the same reasons set forth in the discussion of Grounds Seventeen and Eighteen.

## Ground Twenty

In Ground Twenty, [Weddington] again maintains that his lawyer should have objected when the State questioned [Weddington's] credibility during another portion of the State's closing argument. The Court denies Ground Twenty of [Weddington's] motion for the same reasons set forth in the discussion of Grounds Seventeen, Eighteen, and Nineteen.

## Ground Twenty-One

In Ground Twenty-One, [Weddington] argues his lawyer should have objected to the "inflammatory comments" the State made during its closing argument. Specifically, [Weddington] takes issue with the prosecutor sarcastically referring to the victim as a "behemoth." The prosecutor made this statement as part of her argument questioning [Weddington's] self-defense theory of the case. In context, the prosecutor's statement at issue reads:

> And so we are asking you [to] disregard it, it's meaningless, but for nothing more, to show what stories he's making up about what happened. Stories about [redacted] just totally fabricating that, not even corroborated by a deputy. Yeah, Deputy Mason, he should tell you that [T.G.'s stepfather] took his shirt off and come running at me [sic]. Really? What bias does Deputy Mason have? Did you hear any? Nope. No reason for Deputy Mason to come in here and lie and make something up. Deputy Mason is not the liar.

> What [Weddington] said on the stand reveals a bit about who he is and what he did. I'm not sure if you caught onto his statement about sex is a rough act, sex is a rough act, but [Weddington] is not a rough guy. He's the victim. He was attacked by that behemoth. [She] grabbed him in a headlock and went away at

17

him. Really? What makes sense, not one shred of injury to [Weddington], but we're to believe that he's the victim?

As set forth above, the purpose of closing argument is to review the evidence and illuminate the reasonable inferences the jury may draw from that evidence. *Bertolotti*, 476 So. 2d at 134; *see, e.g.*, *Merck*, 975 So. 2d at 1064. Lawyers are afforded wide latitude during closing argument. *Breedlove*, 413 So. 2d at 8. Therefore, when a defendant claims a prosecutor made an improper comment during closing argument that warrants a new trial, the defendant must show the comments either deprive him of a fair trial, "materially contribute to the conviction, be so harmful or fundamentally tainted as to require a new trial, or be so inflammatory that they might have influenced the jury to reach a more severe verdict than that it would have otherwise." *Spencer v. State*, 645 So. 2d 377, 383 (Fla. 1994).

Here, the prosecutor used sarcasm to express skepticism about [Weddington's] claim that he struck [T.G.] only while acting in self-defense. When viewed in the full context of the trial, there was nothing improper about the prosecutor's remark. And certainly, nothing about the prosecutor's remark was so inflammatory that it improperly prejudiced the result of [Weddington's] trial. Accordingly, the Court denies Ground Twenty-One of [Weddington's] motion.
. . . .

### Ground Twenty-Three

In Ground Twenty-Three, [Weddington] claims his lawyer should have objected when the State allegedly engaged in burden-shifting during its closing argument. The portion of the State's argument that [Weddington] references is:

Who was huffing all night? The defendant. He admitted to it. He admitted they had rough sex, but somehow [T.G.] made this all up. Really? The photographs, his admissions, [redacted.] This justifiable use of force instruction that the jury (sic)

will read you. Oh, if he was acting in self-defense. It's garbage. Garbage. Him getting up there and claiming that, there is no credibility to that, not when there is no shred of injury to him.

Contrary to what [Weddington] suggests, the State did not attempt to shift the burden to him. Rather, the State simply argued that it found [Weddington's] claim of self-defense to be a fanciful one. The State's argument was not improper and therefore, Defense Counsel had no legal basis to object to it. Accordingly, Defense Counsel was not ineffective and the Court denies Ground Twenty-Three of [Weddington's] motion.

Resp. Ex. J at 25–28, 30 (internal record citations omitted). The First DCA *per curiam* affirmed the summary denial of the claims without a written opinion. Resp. Ex. O.

To the extent the claims raised in Ground Two of the Amended Petition have been exhausted by their inclusion in grounds seventeen through twenty-one and ground twenty-three of Weddington's Rule 3.850 motion, this Court addresses them in accordance with the deferential standard for federal court review of state court adjudications. Upon thorough review of the record and the applicable law, the Court concludes that the state court's adjudication of these claims was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented.

Nevertheless, even if the state court's adjudication is not entitled to deference, the exhausted claims in Ground Two must be denied on the merits. By taking the stand, Weddington put his own credibility at issue, which the prosecutor was permitted to attack in light of the evidence at the trial. *See United States v. Baptiste*, 935 F.3d 1304, 1312–13 (11th Cir. 2019) ("[A] prosecutor is justified in arguing during closing arguments that a particular witness is lying, if that is an inference supported by the evidence at trial.") (quoting *United States v. Schmitz*, 634 F.3d 1247, 1270 (11th Cir. 2011)); *Miller*, 926 So. 2d at 1254–55 (stating that "an attorney is allowed to argue reasonable inferences from the evidence and to argue credibility of witnesses or any other relevant issue so long as the argument is based on the evidence"); *Murphy v. Int'l Robotic Sys., Inc.*, 766 So. 2d 1010, 1028 (Fla. 2000) (same); *Craig v. State*, 510 So. 2d 857, 865 (Fla. 1987) (same). Further, during closing arguments, the prosecutor was permitted "to review the evidence and to explicate those inferences which may reasonably be drawn from the evidence." *Bertolotti*, 476 So. 2d at 134; *see also Robinson v. State*, 610 So. 2d 1288, 1290 (Fla. 1992) (same).

Here, the prosecutor's comments on Weddington's truthfulness and guilt,[7] the plausibility of his defense theory, and the credibility of the State's witnesses were permissible, because they were based on the evidence and reasonable inferences therefrom. *See Murphy*, 766 So. 2d at 1029 ("If the evidence supports such a characterization, counsel is not impermissibly stating a personal opinion about the credibility of a witness, but is instead submitting to the jury a conclusion that reasonably may be drawn from the evidence."). Weddington testified that he acted in self-defense after T.G. attacked him on the night of the incident. *See* Resp. Ex. B at 229–33. He emphasized that T.G. was heavier than him, but admitted that she was about the same size at the time of the trial as she was on the day of the incident.[8] *Id.* at 232–33.

T.G.'s testimony contradicted Weddington's version of the events. She testified that without provocation, Weddington, who had been puffing aerosol and drinking alcohol for hours before and during the incident, began repeatedly biting her, hitting her with his fists and with the dust cleaner can, which ripped off her earring, and would not let her leave the residence. *Id.* at 177–87, 191–205, 235 (Petitioner admitting during his trial testimony to

---

[7] Weddington argues the prosecutor improperly expressed an opinion on his guilt by improperly commenting on his truthfulness and the plausibility of his defense. *See* Doc. 8 at 25.

[8] Deputy Mason testified that there was not a significant size difference between T.G. and Weddington. Resp. Ex. B at 166.

drinking beer and "huffing" air duster throughout the day and the night of the

incident).  At one point during the two-and-a-half to three-hour ordeal,

Weddington told T.G. to go over to him and she felt, after the beating she had

sustained, that she had no choice but to text her mother.  *Id.* at 185, 187–88.

She explained:

> I sat next to him, and he looked at me, and he was like, I really want you to know that I'm not a bad person, and then he hit me in the face again, and then he said, I'm a F'ing horrible person, and then that's when he told me I had to go down on him [to perform oral sex].
> . . . .
>
> He kept hitting me in the back of the head, and I started like seeing white and feeling sick, and I told him that I had to go to the bathroom, and he said that if I needed to go to the bathroom, then I could use it on the floor and that I wasn't allowed in there, but I got up and just ran in there anyway and started throwing up, and then that's when I texted my mom.
>
> . . . I texted her, and I tried to call the house phone to try to wake her up, so that the phone would ring and she would check the phone . . . . I would just let it ring, like twice, and then just hung it up, thinking maybe she'd hear the house phone ring and wake up. I don't know if it actually went all the way through or not.

*Id.* Within minutes of receiving the two text messages from T.G.,[9] her mother

and stepfather drove to Weddington's mobile home where they found T.G.

---

[9] T.G.'s first text message, sent at 2:24 a.m. on September 26, 2014, read: "Call the cops now[.]" Resp. Ex. A at 339. At 2:29 a.m., her mother wrote: "Ok il am callthem[.]" *Id.* At 2:31 a.m., T.G. wrote: "Call now[.]" *Id.*

naked, messy, bloody, and with bite marks and bruises all over her body. *See* Resp. Ex. B at 123–25, 144–46, 153, 155–56. T.G.'s stepfather took off his shirt so she could cover her body. *Id.* at 145, 148–49. Shortly thereafter, Deputy Mason arrived on the scene and, together with T.G.'s parents, observed her injuries, which included bite marks "all over her face," at the top of her head, on the right side of her ear, on the back of her neck, under her neck, and around her abdomen and torso areas; a bruise on her stomach; blood behind her ear; and "blood coming from her nose." *Id.* at 123–25, 144–46, 155–56. Deputy Mason testified that T.G.'s injuries "looked pretty severe, very fresh, [and] recent." *Id.* at 156. T.G. was taken to the hospital by an ambulance due to a suspected concussion. *Id.* at 124, 145, 190. A month later, she underwent a surgery for her broken nose. *Id.* at 125, 146, 191.

On cross-examination, Weddington admitted to causing T.G.'s injuries. *Id.* at 238–39, 245, 247. And while Weddington claimed self-defense, there was no evidence of any scratches, bruises, or any other observable injuries on his body when Deputy Mason found him passed out on the bed in his residence, wearing nothing but boxer shorts. *Id.* at 160–61. When Deputy Mason approached Weddington, he did not claim that he was attacked by T.G. or that he was acting in self-defense. *Id.* at 252–53.

23

Considering the totality of the evidence, the prosecutor's comments about Weddington's truthfulness and guilt, the plausibility of his self-defense claim, and the credibility of the State's witnesses were not impermissible, because they were grounded in the evidence and reasonable inferences therefrom. To the extent Weddington claims the prosecutor denigrated him and his defense, as the trial court explained, the prosecutor was merely questioning and expressing skepticism about the plausibility of his self-defense theory in light of the record evidence. *Cf. Miller v. State*, 712 So. 2d 451, 453 (Fla 2d DCA 1998) (reversing for a new trial where there was "ample evidence to support the defense of voluntary intoxication," but the prosecutor ridiculed the defense and misstated the law in contradiction of the judge's instructions).

Also, contrary to Weddington's arguments, none of the prosecutor's comments were so inflammatory that it prejudiced his trial. *See Walls v. State*, 926 So. 2d 1156, 1167 (Fla. 2006) ("In order to require a new trial based on improper prosecutorial comments, the prosecutor's comments must either deprive the defendant of a fair and impartial trial, materially contribute to the conviction, be so harmful or fundamentally tainted as to require a new trial, or be so inflammatory that they might have influenced the jury to reach a more severe verdict than that it would have otherwise."); *Spencer*, 645 So. 2d at 383 (same). Viewing the comments in light of "the totality of the record," the Court

24

does not find them to be "unduly inflammatory." *Darden v. State*, 329 So. 2d 287, 290 (Fla. 1976); *see also Spencer v. State*, 133 So. 2d 729, 731 (Fla. 1961) (refusing to analyze in detail the prosecutors' allegedly inflammatory comments during closing argument, because "considerable latitude is allowed in arguments on the merits of the case, "[l]ogical inferences from the evidence are permissible," and "prosecutors are allowed to advance to the jury all legitimate arguments within the limits of their forensic talents in order to effectuate their enforcement of the criminal laws" as "long as they remain within the limits of the record").

Further, contrary to Weddington's position, the prosecutor did not shift "the burden of proof to the defense by equating the decision[-]making process to a determination of who lied and who told the truth."[10] Doc. 8 at 25. The prosecutor's arguments about the credibility of the witnesses, which were based on the evidence and the reasonable inferences therefrom, did not impermissibly shift the burden of proof. When considered in context, the

---

[10] Interestingly, in his closing argument, Weddington's counsel appears to engage in the same tactic of which Weddington now accuses the prosecutor. *See* Resp. Ex. B at 277, 283 ("If you find her credible, fine. You also have to find him unbelievable or not worthy of belief. . . . After what he told you, you would have to completely reject what he said and completely accept what she said."). As stated by the Florida Supreme Court, it would be "inappropriate to reverse the State's conviction because the prosecutor was making the same alleged errors as defense counsel." *Darden*, 329 So. 2d at 290.

prosecutor's arguments did not invite "the jurors to determine the defendant's guilt based upon their assessment of the credibility of the witnesses" or "for some reason other than that the State has proved its case beyond a reasonable doubt." *Mullins v. State*, 137 So. 3d 558, 561 (Fla. 4th DCA 2014) (internal citations and quotation marks omitted). Rather, the prosecutor argued what the evidence showed and how the State had met its burden of proof. *See, e.g.*, Resp. Ex. B at 258 ("[T]he evidence presented here today shows three things, and only three things. It shows you that the defendant sexually battered [T.G.,] it shows that he falsely imprisoned her, and it shows that he committed a battery against her. And I'm going to talk about how this evidence that the State has presented today, how we've met that burden, that burden that's ours alone."). The trial court then instructed the jury to weigh the evidence and "decide what evidence [was] reliable," considering various factors. Resp. Ex. A at 356–57 ("You may rely upon your own conclusion about the credibility of any witness. A juror may believe or disbelieve all or any part of the evidence or the testimony of any witness."); Resp. Ex. B at 268 (reciting the court's jury instructions, in part, during the prosecutor's closing argument).

Therefore, based on the foregoing, defense counsel was not deficient for failing to object to the prosecutor's comments. *See Miller*, 926 So. 2d at 1255 (affirming the trial court's decision that trial counsel was not ineffective for

failing to object to the prosecutor's argument that the witness was worthy of belief, which was based on the facts surrounding the witness's testimony); *Craig*, 510 So. 2d at 865 (finding that the prosecutor's repeated references to defendant's testimony as being untruthful and to the defendant himself as being a liar did not exceed the bounds of proper argument in view of the evidence).

To the extent Weddington argues for the first time that trial counsel was ineffective for failing to object to the prosecutor's closing arguments that improperly vouched for Deputy Mason's testimony, such claims are unexhausted and procedurally defaulted. *See Kelley v. Sec'y for Dep't of Corrs.*, 377 F.3d 1317, 1344 (11th Cir. 2004) ("[T]he prohibition against raising non[-]exhausted claims in federal court extends not only to broad legal theories of relief, but also to the specific assertions of fact that might support relief."). Weddington asks the Court to excuse the procedural default under *Martinez*, *see* Doc. 8 at 21 n.1, where the Supreme Court held:

> Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.

*Martinez*, 566 U.S. at 17. To demonstrate that a defaulted claim of ineffective assistance of counsel is "substantial," the petitioner "must demonstrate that

the claim has some merit." *Id.* at 14. On the other hand, a claim is "insubstantial" if "it does not have any merit or . . . is wholly without factual support." *Id.* at 16. "The substantiality of the ineffective-assistance-of-trial-counsel claim [is] . . . analyzed under the familiar framework set out in *Strickland.*" *Ayestas v. Davis*, 584 U.S. 28, 50 (2018) (Sotomayor, J., concurring).

Even if Weddington could show that the lack of post-conviction counsel caused his procedural default, he cannot show that his underlying ineffective assistance of counsel claim is substantial under *Martinez*. Weddington argues the prosecutor improperly vouched for Deputy Mason's testimony when she made the following statement in her closing argument:

> Yeah, Deputy Mason, he should tell you that [T.G.'s stepfather] took his shirt off and come [sic] running at [Weddington]. Really? What bias does Deputy Mason have? Did you hear any? None. No reason for Deputy Mason to come in here and lie and make something up. Deputy Mason is not the liar.

Resp. Ex. B at 290.

In doing so, the prosecutor was addressing Weddington's testimony about what happened when Deputy Mason arrived on the scene:

> I hear [O]fficer Mason inside my house calling my name, and I go in there in the living room. . . . He told me to turn around and put my hands behind my back, take [sic] me outside the house. When I'm coming outside of the house, Mr. [T.G.'s stepfather] takes his shirt off and comes up at me, like, he was, I'll beat your - - I'll F'ing kill you. Um, and Officer Mason puts his hand out, Stop,

28

I got it under control, I got it, and he puts me in the back of the top
car.

*Id.* at 234; *see also id.* at 246.

However, Deputy Mason's recollection of the events was quite different
from Weddington's, as he testified on rebuttal as follows:

> Q    Once you placed [Weddington] under arrest and you walked
> him out of the house, did [T.G.'s] father attempt to attack him in
> the front yard?
>
> A    That is incorrect.
>
> Q    Did he rip off his shirt and threaten [Weddington]?
>
> A    No, he did not.

*Id.* at 253.

Weddington's story was not only unsupported by Deputy Mason's
testimony, but also by the testimony of T.G. and her parents. Given the
evidence presented, the prosecutor's comment that "Deputy Mason is not the
liar" was not an improper bolstering of the witness's testimony, but rather a
reasonable inference based on the evidence. In any event, the question of
whether T.G.'s father took off his shirt and attempted to attack Weddington
was merely a collateral issue. The evidence did not show, and Weddington did
not allege, that he was injured from any attack, or perceived attack, on the
night of the events. Furthermore, in determining the witnesses' credibility, the
jury was instructed to consider whether the witnesses had "some interest in

how the case should be decided." Resp. Ex. A at 356. The jury was also instructed that "[t]he fact that a witness is employed in law enforcement does not mean that his testimony deserves more or less consideration than that of any other witness." *Id.* at 357.

Accordingly, defense counsel was not ineffective for failing to object to the prosecutor's comments. *See Pinkney v. Sec'y, Dep't of Corrs.*, 876 F.3d 1290, 1297 (11th Cir. 2017) ("[A]n attorney will not be held to have performed deficiently for failing to perform a futile act, one that would not have gotten his client any relief."); *Diaz v. Sec'y for Dep't of Corrs.*, 402 F.3d 1136, 1142 (11th Cir. 2005) (holding that counsel was not ineffective for failure to raise a meritless argument); *Bolender v. Singletary*, 16 F.3d 1547, 1573 (11th Cir. 1994) (noting that "it is axiomatic that the failure to raise non[-]meritorious issues does not constitute ineffective assistance."). Because Weddington cannot satisfy *Strickland*, he cannot rely on *Martinez* to excuse the procedural default of his unexhausted claim.

Likewise, Weddington has failed to demonstrate that failure to consider his unexhausted claim on the merits will result in a fundamental miscarriage of justice. To establish fundamental miscarriage of justice, a petitioner must demonstrate that a "constitutional violation has probably resulted in the conviction of one who is actually innocent." *Carrier*, 477 U.S. at 496. "'Actual

30

innocence' means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998). To meet this standard, a petitioner must "show that it is more likely than not that no reasonable juror would have convicted him" of the underlying offense. *Schlup*, 513 U.S. at 327. Additionally, "'[t]o be credible,' a claim of actual innocence must be based on reliable evidence not presented at trial." *Calderon*, 523 U.S. at 559 (quoting *Schlup*, 513 U.S. at 324). With the rarity of such evidence, in most cases, allegations of actual innocence are ultimately summarily rejected. *Schlup*, 513 U.S. at 324. Weddington has not met this burden. Based on the foregoing, Ground Two is denied.

### **Ground Three**

As Ground Three, Weddington alleges his trial counsel was ineffective for failing to impeach T.G.'s stepfather, Charles McSwain, with evidence of bias and motivation for testifying against Weddington. Doc. 8 at 31–38. Weddington argues counsel's "failure to elicit the affair between [Mr.] McSwain's [former] wife and Mr. Weddington's father, classic impeachment by showing of bias, was a deficient omission." *Id.* at 34.

Weddington raised a similar claim in ground thirteen of his Rule 3.850 motion. Resp. Ex. I at 18–19 (alleging defense counsel was ineffective for failing to establish Mr. McSwain as an adverse/hostile witness due to his former wife's

31

affair with Weddington's father). The trial court summarily denied the claim
as follows:

> In Ground Thirteen, [Weddington] argues his lawyer was
> ineffective because he "failed to establish" that [Mr. McSwain] was
> an "adverse/hostile witness." [Weddington] alleges that [Mr.
> McSwain's] previous wife once had an extramarital affair with
> [Weddington's] father. [Weddington's] claim fails for several
> distinct reasons.
>
> . . . [H]ere, there was clearly no need for Defense Counsel to
> establish that [Mr. McSwain] was a hostile or adverse witness
> because [he] was a *State* witness.
>
> As for the alleged relationship history between [Mr.
> McSwain's] former spouse and [Weddington's] father,
> [Weddington's] sworn assertions to the trial court belie his claim
> that he wanted Defense Counsel to mention this history at trial.
> After the State rested its case (which included [Mr. McSwain's]
> testimony) and before [Weddington] offered his testimony, the trial
> court conducted a sworn colloquy with [Weddington]. During that
> colloquy, [Weddington] affirmed there was no additional evidence
> he wished to present to the jury other than his own testimony.
> [Weddington] may not obtain postconviction relief through
> contradicting his sworn assertions to the trial court. Accepting the
> allegations contained in Ground Thirteen of [Weddington's] motion
> would require discounting his sworn representations to the trial
> court. *See Kelley v. State*, 109 So. 3d 811, 812–13 (Fla. 1st DCA
> 2013) ("A rule 3.850 motion cannot be used to go behind
> representations the defendant made to the trial court, and the
> court may summarily deny post-conviction claims that are refuted
> by such representations."); *Henry v. State*, 920 So. 2d 1245, 1246
> (Fla. 5th DCA 2006) ("Defendants are bound by the statements
> made by them under oath . . . .").
>
> Finally, there is no basis for concluding that information
> about the alleged relationship between [Weddington's] father and
> [Mr. McSwain's] former spouse would have changed the result at
> trial. The links between that alleged relationship and

32

[Weddington's] trial are attenuated and speculative. *See Maharaj v. State*, 778 So. 2d 944, 951 (Fla. 2000) ("Postconviction relief cannot be based on speculation or possibility.").

For these reasons, the Court denies Ground Thirteen of [Weddington's] motion.

Resp. Ex. J at 23–24 (internal record citations omitted). The First DCA *per curiam* affirmed the summary denial of the claim without a written opinion. Resp. Ex. O.

The parties disagree about the exhaustion of this claim. *See* Doc. 8 at 31 n.3 (asking the Court to excuse the procedural default under *Martinez* in the event the Court finds the claim to be unexhausted); Doc. 13 at 30–35 (engaging in alternative merits analysis). Because this claim must be denied on the merits, the Court will bypass the exhaustion issue.[11] *See Santiago-Lugo v. Warden*, 785 F.3d 467, 475 (11th Cir. 2015) (stating that "even when the defense has been preserved and asserted by the respondent throughout the proceeding, a court may skip over the exhaustion issue if it is easier to deny (not grant, of course, but deny) the petition on the merits without reaching the exhaustion question") (citing *Granberry v. Greer*, 481 U.S. 129, 131 (1987)); *see*

---

[11] According to Weddington, the Court must consider *Strickland*'s performance prong *de novo* because the trial court only addressed the prejudice prong. *See Jonson v. Sec'y, DOC*, 643 F. 3d 907, 930 & n.9 (11th Cir. 2011) (stating that when the state court only addresses one of the two prongs of *Strickland*, the federal court must consider the unaddressed prong *de novo*) (collecting cases). For the reasons that follow, even under a *de novo* review, the claim must be denied.

*also* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

The Court finds that Weddington has shown neither deficient performance nor prejudice from counsel's failure to impeach Mr. McSwain. First, contrary to Weddington's argument, Mr. McSwain was not a key witness, which makes this case distinguishable from cases where counsel has been found deficient for failing to impeach a key witness. *See, e.g.*, *Roberts v. State*, 307 So. 3d 808, 813 (Fla 2d DCA 2018) (reversing the summary denial of a defendant's Rule 3.850 motion and remanding for further proceedings where defense counsel failed to pursue a victim's motive to lie when sexual assault allegations surfaced only after the defendant refused to give her money to open a restaurant); *Kelly v. State*, 198 So. 3d 1077, 1078 (Fla. 5th DCA 2016) (reversing the summary denial of a defendant's Rule 3.850 motion and remanding for an evidentiary hearing where the robbery victim, the State's key witness, admitted to some of his prior convictions, but defense counsel failed to obtain certified copies of the victim's prior convictions in order to conduct proper impeachment regarding the number and nature of the victim's prior convictions); *Burch v. State*, 977 So. 2d 778, 779–80 (Fla. 5th DCA 2008) (reversing the summary denial of a defendant's Rule 3.850 motion and

remanding for an evidentiary hearing where defense counsel failed to impeach the victim regarding a prior conviction for a crime of dishonesty and the trial was essentially a credibility contest between the defendant and the victim). Here, Mr. McSwain's testimony about T.G.'s appearance, injuries, and clothing (or lack of clothing) was merely cumulative to the testimony of his wife, Deputy Mason, and T.G.

Also, it is reasonable to assume the jury was aware that as T.G.'s stepfather, Mr. McSwain would be inclined to testify favorably to T.G. and unfavorably to Weddington. Any additional bias because of Weddington's father's affair with Mr. McSwain's former spouse is speculative and too attenuated to show a reasonable probability that the outcome of the proceedings would have been different. Even if counsel had impeached Mr. McSwain on that basis, the jury would still have the testimony of T.G. and her mother that T.G. was naked upon her parents' arrival, and Deputy Mason's testimony that T.G. was wearing only a t-shirt upon his arrival. *See* Resp. Ex. B at 123 ("She was standing there naked and . . . when we noticed that she didn't have clothes on, [Mr. McSwain] took his shirt off and we put on [T.G.,] and as soon as we had done that, we took her to the car."), 155 ("She was wearing a t-shirt only."), 165 ("She was wearing a t-shirt only. . . . I believe she

35

said it was from her father. . . . I don't remember that specifically."), 189 ("[Mr. McSwain] gave me his shirt and told me to come sit in the car.").

Additionally, to the extent Weddington argues that T.G.'s testimony about being naked was a key aspect of her story and the false imprisonment charge, her testimony appears to refute his argument. Specifically, T.G. testified that Weddington did not allow her to leave the residence even before he made her take off her clothes:

A      . . . I wanted to leave, and every time I tried to walk to the door, . . . he just wouldn't let me out the door.

Q      Do you know why he hit you?

A      No, ma'am.

Q      Was there any argument that was going on?

A      No, ma'am.

Q      No argument about prior girlfriends?

A      No, ma'am.

Q      Was anybody else present in the home when he hit you?

A      No, ma'am.

Q      And throughout this whole ordeal, was there ever anybody else inside the home with you and the defendant?

A      No, ma'am.

Q      So, as you sat there confused, not sure what to do, what did the defendant start doing?

36

A       (Crying). Sorry.

Q       Take your time.

A       I just -- anytime I tried to walk out the bedroom door, he just would push me back or hit me if I tried to walk out and just wouldn't let me leave. He was just acting irate and --

Q       Is there only one door to the bedroom?

A       Yes, ma'am.

Q       And where's the bathroom located in reference to the bedroom?

A       Inside the bedroom.

Q       So the only way you can get into the bathroom is from inside the bedroom?

A       Yes, ma'am.

Q       Was the defendant at any point in time acting violently, throwing things around or --

A       He would[,] like[,] hit the air duster, like huff it and fall into stuff, or like fall towards me, and come to [sic] and tell me that I needed to clean it up, or throw things and yell.

Q       Was there a time that you went into the bathroom?

A       Yes, ma'am.

Q       And what did you do when you went into the bathroom?

A       He -- I got sick, because he hit me, and I had to throw up, and when I went in there, I tried to -- I hid my cell phone underneath the mat by the toilet seat, and that was it, he told me to come back out.

37

Q    When you came out of the bathroom after hiding your phone, what happened when you came back into the bedroom?

A    He was just trying to rush me out of the bathroom. When I came back in, he was still hitting me and he told me that I needed to go outside and get the other can of air duster.

Q    And what did he make you do?

A    He made me take all my clothes off before I went outside.

Q    And did you take off all your clothes?

A    Yes, ma'am.

Q    And did you go outside and get the other can of dust cleaner?

A    Yes, ma'am.

Q    What was the defendant doing while you were outside getting the dust cleaner?

A    He was standing at the doorway waiting for me to come back inside.

Q    When you were inside, did you think about trying to leave and get away?

A    I did, but I knew I couldn't. I mean, what if I tried to run and I got -- I didn't get out. And I was naked, I didn't just want to run to somebody's house naked, and I knew I wouldn't -- I don't run that fast, so I wouldn't have made it out of the yard.

Q    Were you afraid that the defendant would catch you?

A    Yes, ma'am.

Q    What happened when you went back inside with the dust cleaner?

A      I walked in with it and walked back to the bedroom, and he grabbed it from me, just took it and he hit it again and he just --

THE COURT:      Ms. [T.G.]

THE WITNESS:  I'm sorry.

THE COURT:      It's okay. Take a breath, and remember to speak into the microphone.

THE WITNESS:  Yes, sir. I'm sorry.

And he just kept hitting me like he was before and wouldn't let me back out of the bedroom again.
. . .

Q      Were you still naked during this entire time?

A      Yes, ma'am.

Q      What happened when you tried to put clothes on?

A      If I tried to reach for my shorts or my shirt, he hit me.

Q      He hit you?

A      (Nods head).

Q      Did you try to leave and get out of the bedroom?

A      Yes, ma'am.

Q      How did you try to leave?

A      I just tried to walk out the door, and I couldn't get past him at the door, and then at one point I was like, [m]aybe I can get out the bathroom window, but, honestly, in reality[,] it wasn't an option, I wouldn't have had time, but I tried. I thought of things I could do.

39

Q     Do you-all have a telephone inside the residence?

A     My cell phone and his, but I didn't know where his was.

Q     Is there a landline?

A     No, ma'am.

Q     At any point in the evening did the defendant ask you about your phone?

A     Yes, ma'am.

Q     And --

A     He kept asking where it was at, and I just kept telling him that it was inside the car outside, and he said, [g]ood.

Resp. Ex. B at 177–81, 183–84.

Therefore, even if counsel had impeached Mr. McSwain with questions relating to the alleged affair, considering the record evidence, there is no reasonable probability that the outcome of the proceedings would have been different. Thus, Ground Three is denied.

## **Ground Four**

As Ground Four, Weddington alleges his trial counsel was ineffective for failing to elicit testimony from T.G. that her story contradicted Deputy Mason's account of the incident. Doc. 8 at 38–42. Weddington points out that T.G.'s deposition testimony was that Weddington never went to sleep on the night of the events, whereas Deputy Mason testified that Weddington was "passed out"

when he arrived on the scene to the point that it took Deputy Mason several moments to wake him up. *Id.* at 39–40. Weddington adds that his own testimony, which shows that he was sleeping when T.G.'s parents and Deputy Mason arrived, is consistent with Deputy Mason's testimony. *Id.* at 40. Weddington argues his trial counsel was deficient for failing to question T.G. on cross-examination as to whether Weddington was sleeping when the police arrived, missing the opportunity to demonstrate the inconsistency between T.G.'s sworn deposition and Deputy Mason's testimony. *Id.*

Weddington raised this claim in ground one of his Rule 3.850 motion. Resp. Ex. I at 4–5. The trial court summarily denied the claim as follows:

> In Ground One, [Weddington] contends his lawyer should have "argue[d] [a] point of conflicting testimony." [Weddington] believes the victim testified in [her] deposition that [he] never went to sleep on the night of his crimes. [Weddington] makes note of the arresting officer's trial testimony that, upon arriving to the crime scene, he had to wake [Weddington]. [Weddington] avers this is a "direct contradiction" that Counsel "failed to illustrate." However, the record shows that [Weddington] could not have been prejudiced by Counsel not highlighting this alleged contradiction.
> . . . .
>
> Th[e] testimony demonstrates that the exact timing of when [Weddington] was asleep was not a material fact at trial. Officer Mason testified that he found [Weddington] difficult to wake up, but he offered no testimony as to the duration of [Weddington's] sleep. [Weddington] testified that he had only been asleep a short while when the victim's family and Officer Mason arrived. And according to [Weddington], the victim testified at a pre-trial deposition that [Weddington] did not go to sleep on the night at issue. Irrespective of [Weddington's] sleep schedule on September

41

>25, 2014, it is uncontroverted that [Weddington] became violent
>with the victim that night. The central disputed issue at trial was
>why [Weddington] did so. The State contended [Weddington] acted
>violently without justification, while [Weddington] maintained
>that he acted in self-defense. Neither party disputed that
>[Weddington] used some degree of force against the victim. Even
>under [Weddington's] version of events, he only briefly went to
>sleep after the heated episode between [him] and the victim
>concluded.

Resp. Ex. J at 11, 13 (internal record citations omitted). The First DCA *per curiam* affirmed the summary denial of the claim without a written opinion. Resp. Ex. O.

Addressing this claim in accordance with the deferential standard for federal court review of state court adjudications, the Court finds, upon thorough review of the record and the applicable law, that the state court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d).

Nevertheless, even if the state court's adjudication is not entitled to deference, this claim must still be denied on the merits. Weddington argues his trial counsel was ineffective for failing to question T.G. on cross-examination as to whether Weddington was sleeping when the police arrived. Doc. 8 at 40. However, counsel cannot be deficient for failing to cross-examine T.G. as to

42

what Weddington was doing while T.G. was already outside, with her parents, awaiting the arrival of the police.

T.G.'s testimony was clear that while she was in the house, Weddington was awake. *See* Resp. Ex. B at 188–89; Resp. Ex. I at 34. Then, when her parents knocked on the door, she rushed outside, put on a t-shirt, and waited in the car. *See id.* When Deputy Mason arrived on the scene, he spoke with T.G. and her parents *outside* the residence, where he assessed the situation and observed her injuries, and only then, he proceeded to enter the home. Resp. Ex. B at 150–60. Once inside, Deputy Mason found Weddington "passed out" on his bed in the bedroom, and began to shake him for "several moments" to wake him up. *Id.* at 158–60. It is entirely possible that Weddington, who was drinking and huffing dust cleaner for hours, had fallen asleep at this late hour after T.G. was already outside with her parents.

Further, Weddington testified that he "hadn't been asleep that long" when he heard a car door slam and saw headlights in his yard, which he thought was the police. Resp. Ex. B at 233. Then, Weddington heard Officer Mason calling his name and responded by going into his living room. *Id.* Thus, even under Weddington's version of the facts, he was awake when Deputy Mason entered his house, which makes Weddington's testimony more

consistent with T.G.'s deposition and trial testimony rather than with Deputy Mason's trial testimony that he was asleep.

In any event, whether Weddington was sleeping when the police arrived is not a material issue. As the trial court stated, "the exact timing of when Defendant was asleep was not a material fact at trial." Resp. Ex. J at 13. Although Weddington argues his counsel's failure to show the perceived inconsistency between T.G.'s testimony and Deputy Mason's testimony was prejudicial to his case, his argument ignores the time gap between T.G.'s leaving the house and Deputy Mason's entering the house. It is undisputed that Deputy Mason found T.G. *outside* the house, with her parents, and he later met Weddington *inside* the house, while everyone else was still outside. And although Weddington gave the jury his version of the events, it is undisputed that on the night of the events, he was under the influence of both alcohol and aerosol.[12] Indeed, Deputy Mason testified that Weddington's level of intoxication appeared to be "extreme," as "evidenced by his glassy eyes," "very slurred" speech, and apparent incoherence. Resp. Ex. B at 160.

Since T.G.'s testimony is reconcilable with Deputy Mason's testimony, Weddington cannot show prejudice from his counsel's failure to cross-examine

---

[12] In his Reply, Weddington concedes that his recollection of the events was "expectedly imperfect" due to "huffing aerosol all night." Doc. 16 a 24 & n.6.

T.G. in the manner he suggests. Thus, there is no reasonable probability that the outcome would have been different had counsel elicited testimony from T.G. on this point. Therefore, Ground Four is denied.

Accordingly, it is

**ORDERED AND ADJUDGED**:

1.    The Amended Petition (Doc. 8) is **DENIED** and this action is **DISMISSED WITH PREJUDICE**.

2.    The **Clerk of Court** shall enter judgment dismissing this action with prejudice and close this case.

3.    If Petitioner appeals this Order, the Court denies a certificate of appealability.[13] Because the Court has determined that a certificate of appealability is not warranted, the **Clerk** shall terminate from the pending

---

[13] The court should issue a certificate of appealability only if Petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make this substantial showing, Petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke,* 542 U.S. 274, 282 (2004) (quoting *Slack v. McDaniel,* 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further,'" *Miller–El v. Cockrell,* 537 U.S. 322, 335–36 (2003) (quoting *Barefoot v. Estelle,* 463 U.S. 880, 893 n.4 (1983)). Upon due consideration of the record as a whole, this Court will deny a certificate of appealability.

motions report any motion to proceed on appeal as a pauper that may be filed in this case. Such termination shall serve as a denial of the motion.

**DONE AND ORDERED** at Jacksonville, Florida, this 20th day of August, 2025.

_____
BRIAN J. DAVIS
United States District Judge

Jax-11 7/25
c:
Counsel of Record

46